UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| M.A.M.G. and L.H.M.F.,<br>Petitioners,<br>v.<br>SERGIO ALBARRAN, et al.,<br>Respondents. | Case No. 26-cv-06143-RFL<br><br>**ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>Re: Dkt. No. 1 |

Petitioners M.A.M.G., a citizen of Peru, and L.H.M.F, a citizen of Guatemala, are asylum seekers who were each released on parole and enrolled in the Alternative to Detention, Intensive Supervision Appearance Program ("ISAP") shortly after their arrival in the United States. In the years since, Petitioners have complied with ISAP's check-in and photo submission requirements to the best of their abilities.

Since May 2022, M.A.M.G. has been required to submit a photo of herself on a monthly or, more recently, weekly basis. These photos must be taken in a specified place on a specified day during a specified window of time. From 2024 through 2025, M.A.M.G. missed two photo submission cut-offs on days when she was required to work late. Immigration and Customs Enforcement ("ICE") did not follow up after either missed submission. Throughout this time, M.A.M.G. has also been required to check-in in person at ICE's direction. She completed one of these in-person check-ins on April 15, 2026. She was not told during that visit that she needed to report again in person any time soon. However, nine days later, she was told that she had somehow missed a check-in on April 23. She promptly visited the ICE office that same day. During that visit, without notice or hearing, ICE attached an electronic monitor to M.A.M.G.'s

ankle and told her she could no longer leave Northern California.

L.H.M.F. was entered into ISAP in December 2023. Although there is some dispute about whether she missed one photo submission the following year, no action was taken and she undisputedly continued to report as required. In February 2025, L.H.M.F.'s case was heard by an immigration judge, who believed that she has been abused, but found that the abuse was not based on reasons sufficient for asylum. He denied her application, L.H.M.F. appealed, and the Ninth Circuit granted her a temporary stay while the appeal is pending. There is no indication that the immigration judge modified the terms of L.H.M.F.'s parole in any way during this hearing. One year later, in February 2026, L.H.M.F. fell into depression and missed a submission deadline. She submitted a photo the following day. The following month, L.H.M.F.'s phone broke, making her unable to complete her scheduled submission. She sent her phone in for repairs and, after getting it back, reported to the ICE office on March 24. At that visit, without notice or hearing, ICE similarly attached an electronic monitor to L.H.M.F.'s ankle and told her that she could not leave Northern California.

Petitioners assert that ICE's unilateral imposition of ankle monitoring, in the context of their ISAP restrictions, violates their procedural and substantive due process rights under the Fifth Amendment. Petitioners have thus filed a petition for writ of habeas corpus pursuant to 28 U.S.C. Section 2241, requesting release from the additional restraints imposed by ICE. The government responded and does not contest the above facts. Instead, the government argues first that Petitioners are not in "custody" for habeas purposes, and second, that due process has not been offended because ICE acted within its discretion to modify the conditions of Petitioners' release. For the reasons described below, the Petition for Writ of Habeas Corpus is **GRANTED**.[1]

[1] Petitioners' Motion to Seal, (Dkt. No. 2), is **GRANTED**. Petitioners' names may be redacted to protect their privacy. *See* Memorandum Re: Privacy Concern Regarding Social Security & Immigration Opinions (May 1, 2018), https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

## I. LEGAL STANDARD

A writ of habeas corpus is "available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004). "[T]he traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). A court may grant a writ of habeas corpus to a petitioner who demonstrates that they are in custody in violation of the Constitution or federal law. 28 U.S.C. § 2241(c)(3). "[B]esides physical imprisonment, there are other restraints on a man's liberty, restraints not shared by the public generally, which" are sufficient "to support the issuance of habeas corpus." *Jones v. Cunningham*, 371 U.S. 236, 240 (1963). "Custody" thus "encompass[es] circumstances in which the state has imposed significant restraints on a petitioner's liberty." *Munoz v. Smith*, 17 F.4th 1237, 1241 (9th Cir. 2021) (cleaned up). This applies to non-citizens detained within the United States. *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001).

## II. BACKGROUND

The following facts are undisputed, except as noted.

### A. Petitioner M.A.M.G.

Petitioner M.A.M.G. fled from Peru to the United States in May 2022 after gang members threatened to kill her family. (Dkt. No. 2-3 ¶ 2; Dkt. No. 11-2 ¶ 6.) After she fled, gang members in Peru shot M.A.M.G.'s sister, her sister's partner, and her sister's four year old daughter. (Dkt. No. 2-3 ¶ 3.) Only her sister survived. (*Id.*) M.A.M.G. believes this attack was in retaliation for a police report she filed before fleeing, and she fears she will be killed if she ever returns. (*Id.*)

Once she arrived in the United States, M.AM.G. was briefly detained by immigration officials before being released on parole to await her immigration court date, which is currently set for February 16, 2027. (*Id.* ¶¶ 2, 4.) As part of her release, M.A.M.G. was enrolled in ISAP and required to complete monthly photo submissions accordingly. (Dkt. No. 11-2 ¶ 9; Dkt. No. 15-1 ¶ 2.) From May 2022 through January 2026, M.A.M.G. was required to submit a photo taken from inside her home, between the hours of 8:00 a.m. and 5:00 p.m., on a specified day

each month. (Dkt. No. 15-1 ¶ 2.) In January 2026, ICE increased the frequency of M.A.M.G.'s required submissions to weekly. (*Id.* ¶ 6.) M.A.M.G. received permission to take these weekly submissions within the parameters of Northern California and to submit them by 7:00 p.m., after her workday had finished. (*Id.*)

Since 2022, M.A.M.G. has completed these submissions to the best of her abilities. (Dkt. No. 2-3 ¶ 5.) On June 28, 2024, M.A.M.G. could not complete her scheduled submission because she had to work late. (Dkt. No. 15-1 ¶ 3.) She tried to submit a photo once she returned home but received an error message. (*Id.*) Six months later, on February 7, 2025, M.A.M.G. was again required to work late and missed her submission deadline accordingly. (*Id.* ¶ 4.) She did not hear from the government after either of these missed submissions.[2] (*Id.* ¶ 5.)

Aside from the photo submissions, ICE has also required M.A.M.G. to report in-person at certain times to ICE's Tehama office. M.A.M.G. completed one of these in-person check-ins in January 2026. (Dkt. No. 11-2 ¶¶ 15–17.) She did so again on April 15, 2026. (Dkt. No. 2-3 ¶ 6.) She was not told at this visit that she was required to come in again any time soon. (Dkt. No. 15-1 ¶ 7.) Eight days later, on April 23, she missed a call from ICE while working. (Dkt. No. 2-3 ¶ 6.) The following day, ICE told her that she had missed an appointment on April 23. (Dkt. No. 15-1 ¶ 8.) M.A.M.G. had no knowledge of this appointment prior to receiving ICE's call. (*Id.* ¶ 7.) She immediately reported to the ICE office that same day. (*Id.* ¶ 8.) During that visit, ICE agents attached an ankle monitor to M.A.M.G.'s leg and told her she could not travel outside of Northern California. (*Id.*) She was not warned at any time that she would be required to wear an ankle monitor if she missed a check-in. (*Id.* ¶ 9.) Nor was she given notice, a hearing, or any other opportunity to contest these conditions before they were imposed.

The ankle monitor has since caused M.A.M.G. tremendous distress. It cuts her skin,

[2] Deportation Officer Angelo D. Velastegui testified that ISAP contacted M.A.M.G. on April 25, 2024, because "[M.A.M.G.] had not reported in some time." (Dkt. No. 11-2 ¶ 10.) He does not provide any records documenting this contact or showing that M.A.M.G. had not checked in for any period prior to April 25, 2024. Velastegui further testifies that M.A.M.G. checked in as required on May 10, 2024; June 28, 2024; July 25, 2024; and January 15, 2026. (*Id.* ¶¶ 11–13, 17.)

causing blisters and bruises that do not heal. (Dkt. No. 2-3 ¶ 7.) Her tendon hurts, her leg cramps, and she now stumbles when she walks. (*Id.*) She has had to purchase new pants to cover the monitor at work, as she fears it being discovered by her employer. (*Id.* ¶ 8.) The monitor has also exacerbated her anxiety disorder, leading to panic attacks, hair loss, loss of appetite, and tachycardia. (*Id.* ¶ 9.) It blares out a loud male voice that wakes and frightens M.A.M.G.'s children. (*Id.* ¶ 10.) M.A.M.G. cries often and feels consumed by her fears of others judging her. (*Id.* ¶¶ 10–11.)

**B. Petitioner L.H.M.F.**

Petitioner L.H.M.F. fled to the United States in December 2023 after being threatened and violently gang raped by gang members in Guatemala. (Dkt. No. 2-4 ¶ 2.) Upon entering the United States, she was processed for Expedited Removal with Credible Fear. (Dkt. No. 11-3 ¶ 8 & Ex. 1.) She was released shortly after and enrolled in ISAP. (*Id.* ¶ 9; Dkt. No. 2-4 ¶ 3.) She was told to be attentive to her reports, send photos, and download the app onto her phone. (Dkt. No. 15-2 ¶ 6.) She was not told that additional conditions would be imposed if she missed a submission or that ICE could place her on an ankle monitor. (*Id.*) L.H.M.F. has since complied with these requirements to the best of her abilities.[3] (Dkt. No. 2-4 ¶ 5.)

On February 16, 2025, an immigration judge denied L.H.M.F.'s asylum application. (*Id.* ¶ 4.) The immigration judge found that L.H.M.F. was credible, but held that L.H.M.F. had not been hurt for reasons that justified asylum. (*Id.*) L.H.M.F. has since received a temporary stay of her removal from the Ninth Circuit pending the outcome of her appeal. (*Id.*)

One year later, on February 6, 2026, ISAP requested that L.H.M.F. begin reporting for monthly check-ins. (Dkt. No. 11-3 ¶ 13.) L.H.M.F. was severely depressed at this time and missed a photo submission scheduled for February 20. (Dkt. No. 15-2 ¶ 4.) She submitted the

[3] The parties dispute whether L.H.M.F. missed a single check-in on December 4, 2024. Velastegui states that L.H.M.F. missed this deadline. (Dkt. No. 11-3 ¶ 10). L.H.M.F. states that she does not recall missing this check-in and that she normally would have received a message informing her that she needed to submit a photo if she had not yet done so by the afternoon of the check-in day. (Dkt. No. 15-2 ¶ 3.) Neither party submits any additional evidence on this point.

missing photo the following day. (*Id.*) The next month, the battery in L.H.M.F.'s phone swelled and her phone stopped working. (*Id.* ¶ 5.) Because she was unable to use her phone, she could not submit a photo as required on March 10. (*Id.*) She took her phone to a repair shop, where it was eventually fixed. Once her phone was fixed, she saw that ICE had contacted her and directed her to report for an in-person check-in. (*Id.*) She did so as quickly as she could, arriving at the ICE office on March 24, 2026. (*Id.*)

At that check-in, ICE placed an ankle monitor on L.H.M.F. and told her that she could not exit Northern California. (*Id.*) As with M.A.M.G., ICE imposed these conditions upon L.H.M.F. without notice, hearing, or a means to challenge their imposition. L.H.M.F has since experienced severe pain and mental anguish. The ankle monitor rubs constantly against her skin, causing bleeding, friction burns, wounds, blisters, and bruising. (Dkt. No. 2-4 ¶ 7.) Her leg goes numb from the device and she experiences severe cramps in her calf, leading her to lose strength in her left leg. (*Id.* ¶ 8.) L.H.M.F. is constantly anxious and has lost her appetite and motivation for life's activities. (*Id.* ¶ 9.) The monitor wakes her children at night and has forced her to change her daily lifestyle—no longer being able to exercise or wear her normal clothing. (*Id.* ¶¶ 9–11.) She feels immense despair. (*Id.* ¶ 9.)

## III. DISCUSSION

Respondents argue that the conditions Petitioners challenge are not sufficient to render them "in custody" for purposes of habeas relief—both generally, when considering the combination of measures imposed, and specifically when looking to Petitioners' requested relief. Respondents also argue that the conditions imposed here do not violate due process because they fall within ICE's discretion to detain noncitizens throughout removal proceedings and to modify the terms of release. For the reasons described below, neither argument prevails on the facts here.

### A. Petitioners are in custody for purposes of habeas relief.

Courts may grant habeas relief to any individual "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). To be "in

custody," the individual does not need to be physically imprisoned; habeas relief is available where the individual is subject to "restraints not shared by the public generally." *Jones* 371 U.S. at 240.

Many courts across the country and within this district have recently found that the combination of measures imposed upon Petitioners together equate to custody. In *Harrington v. Albarran*, Judge Tigar recently collected these cases, finding "as multiple sister courts have done on similar facts," that a requirement to "appear at particular places and times to comply with ISAP supervision," a restriction "from leaving a radius within Northern California," and a requirement to "wear an ankle monitor around the clock" together "satisfy the definition of 'custody.'" No. 26-CV-01889-JST, 2026 WL 800113, at *4 (N.D. Cal. Mar. 23, 2026). Courts within the Central District of California, Southern District of New York, District of Colardo, Eastern District of Pennsylvania, and District of Oregon have all ruled similarly. *See, e.g.*, *Cruz v. Lyons*, No., 2025 WL 3443146, at *3 (C.D. Cal. Dec. 1, 2025) ("the imposition of additional constraints on Petitioner's liberty following her detention, including electronic monitoring, supports a conclusion that she remains in custody."); *Campbell v. Almodovar*, 2025 WL 3626099, at *1 (S.D.N.Y. Dec. 15, 2025) ("any form of re-detention—including electronic monitoring and mandatory reporting—violates Petitioner's due process rights"); *Batz Barreno v. Baltasar*, 816 F. Supp. 3d 1255, 1258 (D. Colo. 2026) ("Petitioner remains in custody through the conditions of release imposed by ICE. . . . ICE's use of a GPS monitor and other measures instead of a ball and chain makes no difference."); N- N- v. McShane, 813 F. Supp. 3d 496, 502 (E.D. Pa. 2025); *A.B.D. v. Wamsley*, 2026 WL 178306, at *8 (D. Or. Jan. 22, 2026). Judge Pitts and Judge Labson Freeman within the Northern District of California have also arrived at similar results. *See Garro Pinchi v. Albarran*, No. 25-CV-10831-PCP, ___ F.4th ___, 2026 WL 1975598, at *3 (N.D. Cal. July 8, 2026) ("the new supervisory conditions imposed on Ms. Garro Pinchi," including ISAP check-ins and travel restrictions, "are likely custodial because they place significant restraints on Ms. Garro Pinchi's physical liberty."); *Ayala v. Albarran*, No. 5:26-CV-03092-BLF, 2026 WL 1179862, at *3 (N.D. Cal. Apr. 30, 2026) ("such conditions as attending

regularly scheduled in-person check-ins and reporting via the SmartLINK application's facial recognition technology as well as a GPS ankle monitor . . . significantly confine and restrain Mr. Ayala's freedom, and he is accordingly in custody for the purpose of federal habeas jurisdiction." (cleaned up)).

A minority of cases have come out the other way. Respondents rely principally on *Ba v. Lyons*, 2026 WL 218936 (S.D. Cal. Jan. 27, 2026), which declined to find electronic monitoring in combination with location restrictions sufficient to constitute custody pursuant to its reading of *Munoz v. Smith*, 17 F.4th 1237 (9th Cir. 2021). The better reading of *Munoz*, however, supports finding the requirements here to be custodial. In *Munoz*, pursuant to the statutory requirements for supervising convicted sex offenders, the petitioner was required to pay a monthly $30 fee, wear an electronic monitor, reside at an approved location, and inform his parole officer of his current address. 17 F.4th at 1238–39. The Ninth Circuit held that these restrictions were "collateral consequences of conviction, not 'custodial' requirements," largely because they did "not restrict [the petitioner's] movement in any apparent way." *Id.* at 1243, 1245–46. Specifically, the electronic monitoring did not (1) "target[] petitioner's movement in order to impose special requirements," (2) "demand his physical presence at any time or place," or (3) "prevent him from going anywhere." *Id.* at 1245 (cleaned up). The residency and reporting requirements likewise did "not require him to live or be anywhere, either." *Id.* at 1246. Although "a residency approval requirement could in some particularly inhibiting circumstances create a severe or significant restraint on an offender's physical liberty," it found the conditions imposed on Munoz did not rise to that level. *Id.* This case falls within precisely the area distinguished by *Munoz*: the electronic monitoring targets Petitioners' movements to ensure that they appear as demanded at frequent check-ins and prevents Petitioners from going outside Northern California, without any articulated basis in public safety or connection to a criminal conviction. *Harrington*, 2026 WL 800113, at *5. As such, the majority of district courts have read *Munoz* as reinforcing the conclusion that the restrictions at issue are custodial. *See, e.g.*, *id.*

This Court finds the majority view more persuasive. Conditions compelling a person's

physical presence at a given place and time are frequently deemed custodial by the Ninth Circuit. *See, e.g.*, *Hensley v. Mun. Ct., San Jose Milpitas Jud. Dist., Santa Clara Cnty., California*, 411 U.S. 345, 351 (1973) ("[P]etitioner is in custody for purposes of the habeas corpus statute. . . . He cannot come and go as he pleases. His freedom of movement rests in the hands of state judicial officers, who may demand his presence at any time and without a moment's notice."). In *Means v. Navajo Nation*, for example, the Ninth Circuit found that a petitioner was in custody where he was required to discontinue contact with their former father-in law, stay at least 100 yards away from the former father-in-law's home, and "appear as ordered by the Navajo trial court or face re-arrest and additional punishment for any failure to appear." 432 F.3d 924, 928 (9th Cir. 2005). In *Dow v. Circuit Court of the First Circuit Through Huddy*, the Ninth Circuit held that a sentence requiring 14 hours of attendance at an alcohol rehabilitation program rendered the person "in custody" because it required the person's "physical presence at a particular place," and thus "significantly restrain[ed his] liberty to do those things which free persons in the United States are entitled to do and therefore must be characterized, for jurisdictional purposes, as 'custody.'" 995 F.2d 922, 923 (9th Cir.1993). Where custody has not been found, it is generally because the challenged constraints "lack the discernible impediment to movement that typically satisfies the 'in custody' requirement." *Williamson v. Gregoire*, 151 F.3d 1180, 1184 (9th Cir. 1998).

Here, the conditions imposed upon Petitioners discernably impede their freedom of movement. Petitioners were not fitted with ankle monitors in isolation. They were given ankle monitors to enforce ISAP's physical check-in requirements and associated movement restrictions. It is the "combined effect" of these measures—not the mere fact of ankle monitoring—that targets Petitioners' movement and renders the monitoring custodial. *Munoz*, 17 F.4th at 1244. Petitioners' request to remove the ankle monitors thus targets the fact and duration of their custody, even if Petitioners would otherwise be willing to attend check-ins and

remain within Northern California.[4] Habeas is properly requested in this circumstance.

**B. Respondents violated Petitioners' procedural due process rights.**

The record shows that Respondents have violated Petitioners' procedural due process rights. Certainly, there may be circumstances in which ICE need not offer a pre-deprivation hearing before adding electronic monitoring to a person's ISAP requirements. But here, where the record shows at most minor technical violations over years of ISAP enrollment, and there is no indication of flight risk, danger to the community, or materially changed circumstances, Petitioners were entitled to notice and hearing.

Respondents first argue that there can be no due process violation because ICE has statutory authority to set and modify the conditions of Petitioners' release. Compliance with statutory requirements does not relieve the government of its due process obligations under the Constitution. *See*, *e.g.*, *United States v. Rivera-Valdes*, 157 F.4th 978, 989 (9th Cir. 2025); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 196 (D.C. Cir. 2001) ("While we determine that the designation was in compliance with the statute, we further determine that the designation does violate the due process rights of the petitioners under the Fifth Amendment."). Whether due process has been violated thus depends on the facts underlying ICE's imposition of these custodial conditions.

Under the Due Process Clause of the Fifth Amendment to the United States Constitution, no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690 (citing *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)). Three factors are relevant to

---

[4] Both Petitioners were already enrolled in ISAP and, at least initially, did not challenge those enrollments. Petitioners instead challenged the additional electronic monitoring added in March and April 2026. In the Prayer for Relief, Petitioners seek "a writ of habeas corpus ordering Respondents to immediately remove Petitioners' ankle monitors" and to "[g]rant such further relief as the Court deems just and proper." (Dkt. No. 1 at 11–12.) In their Traverse, Petitioners additionally request relief from ISAP monitoring. (Dkt. No. 15 at 2.) The Court considers Petitioners' requests as stated in their Petition.

the due process inquiry set out in *Mathews v. Eldridge*—"the private interest that will be affected by the official action," "the risk of an erroneous deprivation . . . and the probable value, if any, of additional or substitute procedural safeguards," and "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. 319, 335. (1976). "As other courts have found, all three *Mathews* factors support requiring a hearing before a noncitizen released from immigration detention can be subject to custody in the form of ankle monitoring and ISAP supervision." *Harrington v. Albarran*, 2026 WL 800113, at *6.

Petitioners have a substantial private interest in remaining out of custody. *See Morrissey v. Brewer*, 408 U.S. 471, 482 (1972); *Garro Pinchi v. Albarran*, 2026 WL 1975598, at *5 ("freedom from physical constraint is a core concern of the Due Process Clause, and the new supervisory conditions imposed by DHS curtail Ms. Garro Pinchi's physical liberty by compelling her in-person attendance at check-ins for hours every month and circumscribing her freedom of movement."). Each have been released on Orders of Recognizance, which means the government has found "such release would not pose a danger to property or persons, and that the [petitioners are] likely to appear for any future proceedings." 8 C.F.R. § 236.1(c)(8); *see also Rodriguez Vazquez v. Bostock*, No. 25-6842, ___ F.4th ___, 2026 WL 2196424, at *5 (9th Cir. July 30, 2026) ("A § 1226(a) detainee will be released on bond if he demonstrates by a preponderance of the evidence that he is not a flight risk or a danger to the community."). Courts routinely find that individuals released from immigration custody on bond have a protectable liberty interest in remaining out of custody on said bond. *See, e.g.*, *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 969 (N.D. Cal. 2019) ("Just as people on preparole, parole, and probation status have a liberty interest, so too does Ortega have a liberty interest in remaining out of custody on bond."). Such is the case here.

So too is there a significant risk of erroneous deprivation that the additional procedural safeguard of a pre-detention hearing would help guard against. Civil immigration detention must be "nonpunitive in purpose" and bear a "reasonable relation" to the authorized statutory purposes

of preventing flight and danger to the community. *Zadvydas*, 533 U.S. at 690. Missed check-ins can frequently be relevant to a person's flight determination. If a person misses check-ins without sufficient explanation, the risk of erroneous deprivation may lower. That risk may also lower if the missed check-ins give reason to believe the person is intending to flee. Situations surely exist where the person's check-in behavior lowers the risk of erroneous deprivation so much that no hearing is required. This is not that situation.

All the record shows here is that Petitioners have each missed a few isolated ISAP check-ins throughout their years of monitoring. Each missed check-in has been explained, and Petitioners sought to quickly remedy the errors each time. Respondents frame these missed check-ins as violating the conditions of Petitioners' release, but there is no evidence in the record showing what constitutes an ISAP violation. Even assuming that some ISAP check-in requirements have been violated, Respondents have not shown that these minor, sporadic, technical violations amount to flight risk. *See Bernal v. Albarran*, No. 25-CV-09772-RS, 2025 WL 3281422, at *6 (N.D. Cal. Nov. 25, 2025), *appeal dismissed sub nom. Hernandez Bernal v. Albarran*, No. 26-484, 2026 WL 1133189 (9th Cir. Feb. 25, 2026) ("Though they point to minor, technical violations, they have not explained how those violations make Bernal dangerous or a flight risk. That is probably because, of course, they do not."). By contrast, Petitioners have explained why they missed each check-in—including, for M.A.M.G., having never been told that the check-in existed at all. (*See* Dkt. No. 2-3 ¶ 6.) L.H.M.F.'s petition does present a closer call because she missed two check-ins in the two months before the ankle monitor was added. But, ultimately, it is undisputed that both Petitioners diligently tried to correct their missed check-ins by sending photos and promptly reporting to the ICE office, undermining any conclusion that either intended to flee or would not appear as required for their immigration cases. These facts exemplify why the risk of erroneous deprivation is so great. Petitioners have had no opportunity to explain the circumstances of their missed check-ins and no decision-maker has ruled on the sufficiency of those explanations. On this record, the risk of erroneous deprivation is high.

Finally, the government's countervailing interest in imposing these custodial

requirements on Petitioners is relatively low for the reasons just discussed. *See also Ayala*, 2026 WL 1179862, at *4 ("Like other courts in this district, this Court concludes that the government's interest in re-detaining Mr. Ayala without a hearing is 'low,' particularly in light of the fact that he has appeared for prior immigration hearings and does not have a criminal record."). Nothing in the record suggests that Petitioners pose a flight risk or risk of danger to the community.

Altogether, Petitioners have shown that their procedural due process rights have been violated and that habeas relief is warranted. Having found that Petitioners' custody is in violation of their constitutional rights, the Court does not reach Petitioners' additional arguments.

## IV. REMEDY

Upon finding a constitutional violation, a district court "may" grant a writ of habeas corpus and "dispose of the matter as law and justice require." 28 U.S.C. § 2241(a), 2243. Release from detention is the "typical remedy" for "unlawful executive detention." *Munaf v. Geren*, 553 U.S. 674, 693 (2008). Release from Petitioners' custodial conditions is appropriate here. In this instance, that means relieving Petitioners of the supervisory conditions to which they were not subject prior to April 2026, for M.A.M.G., and March 2026, for L.H.M.F. Furthermore, to ensure that Petitioners' release pursuant to this Order is not "rendered meaningless," it is necessary to enjoin the government from re-detaining Petitioners or imposing new conditions of release upon Petitioners without due process and a proper justification. *See Rodriguez-Acurio v. Almodovar*, 811 F. Supp. 3d 274, 321–22 & nn.19–20 (E.D.N.Y. 2025) (collecting cases); *Martinez v. McAleenan*, 385 F. Supp. 3d 349, 373 (S.D.N.Y. 2019). As a result, the relief ordered below falls within the core of habeas.

## V. CONCLUSION

For the reasons described above, the Petition for Writ of Habeas Corpus is **GRANTED**. Petitioner M.A.M.G. shall be released from custody immediately on the same conditions of arrest previously imposed on her prior to April 2026. L.H.M.F. shall likewise be released from

custody immediately on the same conditions of arrest previously imposed on her prior to March 2026.

Respondents shall not re-detain either Petitioner: (1) without notice and a pre-deprivation hearing before a neutral decisionmaker in which an individualized determination is made that she poses a flight risk or danger to public safety such that she must be detained; or (2) in the absence of a material change in circumstances since her most recent release justifying her detention. For avoidance of doubt, "re-detention" includes the addition of custodial constraints, including but not limited to electronic monitoring used in connection with ISAP monitoring and movement restrictions.

This Order does not bar Respondents from lawfully re-detaining Petitioners to execute a valid, administratively final removal order after complying with all constitutional, statutory, and regulatory requirements.

**IT IS SO ORDERED.**

Dated: August 27, 2026

RITA F. LIN
United States District Judge